Thank you. Good morning, Your Honors. My name is Howard Myers, and I represent the appellant, First National Bank of Arizona. We'd like to, at this time, reserve five minutes. We'll try to help, but please keep track of your own time. This appeal deals with two issues, one, an issue relating to an improper summary judgment, and secondly, an issue relating to the award of attorney's fees under a state fee-shifting statute. The summary judgment in this case was granted on the defendant's cross motion for summary judgment on the affirmative defense of accord and satisfaction. Now, let me just make sure I got my procedures straight. There were cross motions for summary judgment. Your motion for summary judgment was denied. Did you appeal that denial of your motion for summary judgment? Is that in front of us? No, Your Honor. Our motion for summary judgment was not denied. The Court found that it was moved. Because it was granted the other one? Yes. Well, it sounds like a denial. But that's not in any event in front of us. The only thing that's in front of us is the appeal from the granted summary judgment to the other side. Yes. Specifically, I think the tenor of the Court's ruling was that it did not have to consider it. Okay. The accord and satisfaction that was alleged by the — was based on a factual dispute that the bank and the common debtor of the bank and BP Arkel, an oil company, had fully resolved prior to the time of a June 21, 2002, instruction letter that the bank — that the Court misrelied upon in concluding that an accord and satisfaction had occurred. Just to give Your Honors a little setup, the bank loaned $2.8 million and three of which Mr. Lavin was a member. He signed two guarantees with respect to those loans. BP Arkel is an oil company, and they had a franchise program under the name AMPM, and they had provided some financing to the LLC as well. So what we have is two competing creditors for a fund of money that was held by John Hancock in the form of a variable annuity. A variable annuity is just really an investment account. The annuitant gets to select between a variety of different mutual funds and other products, and it is regarded as a general and tangible under the Uniform Commercial Code. It's not an insurance product, and it's conceded in the record by John Hancock that it's covered by securities laws, and the securities laws have an exemption for insurance products. The dispute got set up when the bank made a demand for the entire annuity account. On April 29th of 2002, the Lavin's attorney wrote to John Hancock, saying, we claim that the guarantee only extends to 109,000, not to the entire balance of the account. We also claim that there are some marital community issues under Arizona law because Mrs. Lavin did not join. That's the letter that the bank said evidenced that an accord in satisfaction had been effected on June 21st, 2002. Robertson I'm sorry. Say that one more time. That is the letter that the Court said created a dispute. Kagan I read a letter. Maybe I didn't read the right letter. Roberts It's in the record, but it's probably not as an attachment. The June 21 letter that I'm familiar with is that says that basically that we have entered into a settlement, the terms of which I'm not at liberty to disclose, and you can disperse the following amounts of money. Kagan But there's the June 12th settlement agreement that is attached. Kagan But is there another June 21st letter? Roberts No. It's April 29th, Your Honor. Kagan Oh, I see. Okay. Roberts And that's where the bank the Court sees on that letter. However, on June 12th, that controversy was settled. They agreed that the entire account could go to the bank. The Lavins did. Mrs. Lavin agreed that she would be bound by the guarantees. And on June 12th of 2002, a letter went out from counsel for the bank to Vivian McCoy at John Hancock saying, this matter has been settled. Send us all of the money. Enclosed with that letter … Kagan All of the money? Roberts Yes. Kagan What date was that? Roberts June 12th. Kagan Oh, June 12th. Okay. Roberts And essentially simultaneously with the reaching of the settlement agreement on that … on that same date. Kagan Right. Roberts More importantly for purposes of summary judgment, a consent was enclosed, signed by both of the Lavins and also signed by their counsel, Mr. Mettler, who had sent the April 29th letter, and in … and it was notarized. That consent appointed the bank as the attorney, in fact, for the Lavins with reference to the John Hancock account. But more importantly, it specifically stated that we withdraw our letter of April 29th, 2002, raising this controversy, and it is of no further force and effect. And yet, in ruling upon the summary judgment, the Court ignored the … both the settlement agreement, no reference was made to the settlement agreement, ignored that consent and said, aha, the June 21st letter speaks … Kennedy Let me … let me do your narrative just another moment before we get to what the court … district court did or didn't do. Okay. So there's this agreement that we have in the record on June the 12th. There's the letter that's sent to the bank on June the 12th asking for the entire sum to be turned over. Thereafter, as I understand it, the bank says, no, I won't turn it over because I'm worried about a claim … excuse me, it's left to the bank, the letter is to John Hancock, I'm sorry. John Hancock responds, well, I won't turn the entire amount over because I've got this worry that here I am a stakeholder and I may owe some of this money to BP ARCO. And then June 21st, here comes the letter that says, well, you can disperse at least this amount of money … Yes. … pursuant to a settlement that we will … whose terms we will not disclose because it's confidential. And if you disperse this amount of money, not to worry, that leaves enough money in the account to cover the claim by BP ARCO. That's the narrative? That's the narrative in large measure, yes. Okay. Is there something we should add to that narrative? Well, just that the June 21st, 2002 letter upon which the bank relied, first it was prepared in the first instance by counsel for the Lavins. Secondly, it states on its face, this letter is to confirm prior instructions. It's just ancillary to the larger settlement, and it has a limited purpose. It further stated that what Mr. Lavin wanted to have happen is for $165,000 to be sent by his account by John Hancock to the bank. It has nothing to do with waiving or releasing claims. And at the summary judgment record, the only evidence besides the documents was the affidavit of Timothy Alexander, who was a bank vice president, and it was attached in the controverting statement of facts submitted to counter the motion for the cross-motion for summary judgment. In there, he says we had no negotiation with John Hancock. We had no negotiation with BP Arco, and we had no intent to waive our claim. Nobody one of the classic elements of accord and satisfaction is somebody says, hey, you want a check? You have to take what we're offering you. That was not done. There was not. Counsel, that was kind of the amount was kind of a compromise amount as opposed to the exact amount that was demanded or the exact amount that was claimed to be owed or conceded to be due. This case to me represents the problem with confidential settlements, because when you see this letter saying we've settled the disputes, that sort of implies that everything has been agreed upon. And when you're saying that the settlement terms are confidential and the agreement is confidential, no one expects to see the agreement because it's confidential. So that creates a problem in terms of deciding what the terms are. Your Honor, the role of John Hancock was nothing more than they were a debtor of the Lavins. They the account is set up, money is deposited in it, and the Lavins have the right to withdraw, and it's just like a bank. And it's nothing more than a debtor-credit relationship. And there is no standing on the part of a bank or an insurance company in this situation to do anything more than say, hey, you know, here's your money. In the facts at bar, there was never any controversy whatsoever about the $165,000. There's nothing in the record where there was any kind of conflict raised by either I talk about two tiers. An undisputed tier of the $165,000, a disputed tier of about $175,000. And the issue with regards to accord and satisfaction is this. You have to have a meeting of the minds. There is nothing in the record to indicate a meeting of the minds, with the exception of the settlement between the Lavins and the bank. And that meeting of the minds was that the bank could have the entire account. And secondly, there has to be consideration. Let me see if I understand this. Hancock is essentially a stakeholder. It's got this annuity account that's worth, I don't know, something over $350,000, somewhere in that neighborhood. And it's got the following potential claimants on it. It's got the Lavins, it's got the bank, and it's got BP Arco. The Lavins and the bank enter into a settlement agreement on June the 12th. Pursuant to that, the bank sends a letter to John Hancock and says, send us all the money in the annuity account. The bank, excuse me, John Hancock, understandably concerned that they've got a potential problem coming at them from the BP Arco side, says no, we're the stakeholder and we don't want to pay money out that they think we owe them because we may get put on the hook until later. Then on the 21st, nine days after the settlement agreement and the first letter, we get the second letter signed by Lavin and the bank, not by BP Arco, that says, well, at least send us the money that BP Arco doesn't have a claim to. We have settled this between the two of us. It's confidential. You don't need to know that. The terms are not in this letter, but you can send us that amount of money. And it's that June 21st letter that the district court is a settlement. Have I got that straight? But the what the district court said was, the reason the district court found that was a settlement was because it ignored the June 12th settlement. It ignored the consent saying we withdraw the April 29th letter. It said the settlement was a resolution of a contested claim between the bank and the Lavins concerning the $165,000. What the bank said was the settlement was a resolution of a contested claim between the bank and the Lavins concerning the $165,000. That is to say, I see nothing in the June 21st letter that does anything other than reference the settlement that was reached on the 12th of June. And the mistake of the district court was it said, well, we have this letter of April 29th saying that the bank is only has a claim for $109,000. They got $165,000, that's $55,000 more, and that's the accord and satisfaction the district court found, and that was not the accord and satisfaction between the parties. And the terms of the record, and it's in the record, the the terms of the record, if the amount that was given was more than the collateral assignment was for $109,500. Right? That was correct, but there was also a security agreement, and it's not denominated a security agreement. It's a denominated account deposit agreement, but it has all the elements of the security agreement. And there was also a recorded UCC-1 financing statement, and that was the bank's motion for summary judgment. We've recorded a UCC-1 financing statement. BP ARCO did. We prevail under the Uniform Commercial Code. But the court the court's determination that this was an accord and satisfaction was predicated upon the amount of the collateral assignment, which was $109,500. Right? Isn't that what the court? And the court said you got more than that, so that there was some give-and-take in terms of you got more than the insurance company said you were entitled to, but less than you said you were entitled to. So that's why the court found an accord and satisfaction. Your Honor, it was really not the place of the insurance company. But I'm just asking, is that what the court found? That's what the court found. Okay. But one of the things you have to have for an accord and satisfaction is competency of the parties. A stakeholder is not in a position to negotiate. It just holds the money and says, hey, I can't give it to you because somebody else makes the claim. But was the insurance company truly a stakeholder if it were also sued for amounts over and above what it had what it was holding? They were not. There was no suit in existence at this time. Well, demand. There was a demand. But, you know, one of the problems is that you have to be, under Arizona law, you have to get something to which you're not entitled for there to be an accord and satisfaction. You have to have a disputed or unliquidated claim. And there was no dispute with regards to the $165,000. John Hancock said, you know, there was no dispute. That's why they released it. BP ARCO doesn't even appear in the negotiations or the chain of events. They're off until this litigation was started. And so there was no accord and satisfaction, even though the court found there was, because you did not have the meeting of the minds. You did not have consideration. No, the bank was the assignee of the Lavins with regards to the $165,000. They just got what the Lavins were entitled to. They didn't get one dime. How was the $165,000 calculated? There was apparently the amount in the account over and above the $175,000 that they were concerned about with BP ARCO. It was not a negotiated amount between the Lavins and the bank. The negotiated amounts between the Lavins and the bank are set forth in the settlement agreement. They total about $357,000. But what happened was those were the only funds that were undisputed, and we took them as banks are wanted to, you know, and it was applied against the account indebtedness. If there are no further questions from the bench at this time, you're just under five minutes. Let's hear from the other side, and then you'll got some time. Thank you. Well, I do want to go, and I'm sorry. I think I should address the attorney's fees. And in doing so, I just want to briefly say there is no privity of contract between any of the litigants before the court today. BP ARCO and the bank had a common debtor, the Lavins. John Hancock was the stakeholder, but there's no piece of paper signed by the bank, the Lavins, and John Hancock. There's no piece of paper signed by the bank, the Lavins, and BP ARCO. And so, they are strangers to one another. And the only thing that was happening was that there was this dispute over this common fund of money, and there was a, what we've described as a UCC priority dispute. Who has a perfected right in these funds? And nothing more. And there's no basis under the applicable law in the state fee-shifting statute to award fees where a party, where parties are not in some privity of contract. Okay. Thank you. Okay. Thank you. And you still have some time saved. Good morning. May it please the Court, Counsel. My name's William Dimlong, and myself and Chad Baker are here on behalf of the John Hancock entities. I'm going to try to speak about 10 minutes, and then Mr. Wolf is going to speak on behalf of ARCO. Okay. As this Court knows, Arizona, like most jurisdictions, favor compromise and settlement. There's reasons for that. There's to make sure that there's an agreement that resolves disputes, prevents further litigation, and ensures continuity of commercial transactions. In this case, the Court's obviously very well versed with the facts of the underlying matter. So I'd like to kind of dispel some of the things that Mr. Meyer said about these agreements. First of all, as the Court knows, there is a contract. John Hancock had an annuity contract with Mr. Lavin. Under the paragraph 19 of it talks about the obligations for assignments. In this particular case, John Hancock agreed to a collateral assignment with BP ARCO. That's a written document. And they do have a relationship with BP ARCO, and rights and responsibilities flow from that. John Hancock then had a collateral assignment for only $109,500 that was sent to it during the course of this matter. And that particular obligation was given by Mr. Lavin to, in this case, the bank. Mr. Myers talks about this other deposit account assignment. That's something the bank did with the Lavins. That was never presented pursuant to the terms of the annuity contract to John Hancock. What happened in this case, of course, is John Hancock would have loved to have been just an innocent stakeholder. But as the Court knows by looking at the letters, the bank was threatening. They argued they had the entire sum. Whatever was outstanding is theirs. And if we don't give it to them, they're going to sue us for breach of duty, a breach of the contract, a breach of those items. If you look at the different letters in April and June, that was a constant theme and threat made by the bank, which ultimately ended up in the complaint, in First Amendment's complaint, that we're before this Court for. The Lavins, as Mr. Myers indicated, had its own, at one point said, you can't give that. It's only $109,000. There's five different reasons, lack of competency, some other things. My wife wasn't there. It was community property. You can't give it to them. What Mr. Myers focuses on is this June 12th letter that purportedly the Lavins and the bank make peace. You don't mean letter. You mean something that's labeled agreement. Correct. Correct. Signed by both parties? Signed by both parties. But what happens, and the bank has made the attorney, in fact, for the Lavins. The problem is, if you're sitting in John Hancock, the bank has never relinquished its argument. It's entitled to the entire sum. Right. Let me cut to the chase. I think this is cutting to the chase. As I understand it, what the district court did was to view this letter sent to John Hancock jointly by the Lavins and signed by the bank on June 21st as settling not merely any dispute between the Lavins and the bank, but also settling ARCO's entitlement to the remaining funds. Is that right? Well, I think, I don't know if I would characterize it as settling ARCO's entitlement. I think I would characterize it, it settles the bank's entitlement to collateral assignment based upon the allegations they'd made prior to that point in time. Do you understand the difference? No, I'm not sure I do. Okay. Again, from our perspective, Your Honor, the bank is seeking the $357,000 and at one point the Lavins basically opposed it, then they got on board with it. Mr. Meyer's argument is, well, gee whiz, we could have got the $109,500 without question, which is true. They could have got that. Where their argument fails is the additional amount. They say, well, Mr. Lavin could have withdrawn that at any point because it's his money. That's untrue because at that point in time, the bank is already making a claim for an amount in excess of the $109,000. So here we are stuck with still the $175,000 BP ARCO and the bank asserting rights greater than $109,000. A different way, I'm looking at the agreement that was entered into between the Lavins and the bank on June the 12th and then I'm looking at the letter sent by the Lavins and the bank to John Hancock on the 21st. Yes. Is that letter sent on the 21st in any way inconsistent with the agreement entered into on the 12th? Well, I'm not sure if it's inconsistent, but it's a separate agreement. The June the 12th. But wait a minute. First off, I want to know if it's inconsistent. I don't think it's inconsistent in the sense that what the June 12th agreement had. In fact, if you look at the June 12th agreement. In other words, you'd be quite content if the Court were to look at the June 12th agreement and say, well, just enforce the June 12th agreement? Well, that'd be fine because the June 12th against the Lavins and the bank. We weren't a part of that. What it says in there, however, is the bank's entitled to whatever sums are there. However, if there's any, if the bank. And I'm sorry, you're representing? John Hancock. Yes. But that agreement also says if the bank isn't entitled to the whole sum, it actually outlines how those monies are going to be. Meaning now we're talking about June 21st letter? The June 12th agreement. Okay. But that's still an agreement between those two parties, which again, they're free to do. The issue here, however, Your Honor, is whether or not there was a court of satisfaction between John Hancock and the bank and the Lavins in this case where there's a dispute as to who's entitled what portions of the sum. Now. Hancock. From John Hancock and not between those two parties. So that's the distinction you're making. The Lavins, by the June 21st, frankly, the Lavins and the bank, even if you consider them as one, it doesn't change the fact that the bank is still asserting a right to the entire proceeds. It's no different than if the Lavins attempted to say I want my entire account for me, it could have said I want the entire account for the bank. John Hancock could not do that because of the collateral assignment by BP ARCO. And as such, when they send this letter after, again, these negotiations where John Hancock has been accused by both of them of breaching duties and things of that nature, which end up in the lawsuit against John Hancock, when you look at that and culminate with this agreement, if you look at it, it says that the Lavins and the bank agree that this is the amount that is going to go to this account. But it doesn't say this is the total amount. It says please send this amount now. We've reached a settlement, the terms of which we're not going to tell you. Correct. But, Your Honor, in this case, if you look at, first of all, if you look at FLAGO, which is an Arizona case that we cited at page 14 of our brief, that case talks about the fact that, you know, you can compromise an amount for, you know, if there's an undisputed amount and a disputed amount. No, I understand. I'm just having trouble with the narrative because it keeps slipping around on me. What's the nature of this suit against the bank? I mean, excuse me, against John Hancock? What are you alleged to have done that was bad? Well, I mean, you're just hanging on to this money and you're trying to figure out who I'm supposed to send it to. Well, and that's the rub of it, Your Honor. Here we are. We're the stakeholders. We're just trying. And we couldn't, well, the rub is they're saying we breached duties and they said we breached contracts. And what are those duties? Well, the duties, I think, are flowing from the collateral assignment that was given to the Lavins for the, by the Lavins for the $109,500. And although this isn't styled as such, this looks to me like, in consequence, an interpleader suit. Unfortunately, that would have been great, but we couldn't interplead the action because we didn't have conflicting claims. At that point in time, ARCO's claim to those monies was not right. That was based upon a loan that ARCO had with the Lavins, and that wasn't in default. So they weren't making a claim for the funds. The best we could do is file a DEC action to sort this all out. However, again, because we had this agreement with them, the accord, that you pay us this $165,000, this bank account, our action by go ahead and transferring that funds within two days of them asking for that was the consideration in our --. I don't understand how your client is hurt if we were to conclude that the June 21st is not a settlement or an accord in satisfaction. It's just an instruction to you to send a certain amount of money, and that there isn't a settlement out here on June the 12th. I mean, why does that put you in a worse position? Well, because of the allegations in the First Amendment complaint where they're claiming we still breached duties to both, well, to the bank based upon contractual basis, and that's the whole point. That's the reason --. The bank is trying to get more money? Is that what you're saying? The bank is trying to get more money? Absolutely. More money than is in this annuity account? Not only are they trying to get the money that's in the annuity account, their allegation and their prayer for relief actually asked for a $45,000 withdrawal that Mr. Lavin made between the time period of the collateral assignment for 109 and this agreement coming up in April of 2002. So there's a period of --. They're claiming that you allowed impairment of the collateral. Absolutely. So that's a different deal then. Okay. Well, so there is, again, Your Honor, insurance companies love to be innocent stakeholders. In this case, we weren't. At least you think you are, but there's an argument you aren't. Well, we are in a sense, but they've got us. But the bottom --. So that you are not really in the posture of being a stockholder. Right. But if you look at the June 21st letter, Your Honor, which, of course, is the key here, but you have to look at the culmination of what occurred because there's the Kephart case we cited from the Ninth Circuit talking about. You can look at the facts and circumstances surrounding the accord and satisfaction. You don't need payment in full. You don't need the precise magic words in order to still facilitate accord and satisfaction, especially when you've got sophisticated parties such as a bank, an insurance company, and an oil company, even though they weren't part of this agreement, that's represented by counsel. If you look, Your Honor, at that June 21st letter, what you'll also see is just look at the language. When Mr. Myers hand-typewrites on his concurrence with this, he says he consents to the terms. Terms, again, is a contractual nature that connotates more of a contractual nature agreement. It's not merely, gee, send John Hancock, go ahead and pass this money over to him. It's just another --. I'm just reading what he typed. The undersigned hereby gives consent of Assamie First National Bank of Arizona to the above-referenced terms. Correct. That's pretty, you know, that's pretty opaque. Well, I think at least it says, listen, you can send the money. It's okay with me. Well, we would submit to you, Your Honors, that the, that agreement, by virtue of some of the wording there, but more importantly, the actions that occurred prior to that instance where both of those parties are claiming certain duties and rights based upon John Hancock's actions, created the court in satisfaction. Why would you use the word terms if it's just an instruction to send money? Well, that's our point, Your Honor. And again, in the, the language of the actual letter that was written by Mr. Lavin's counsel also used the word agreement. If, if you take their argument at its face, arguably, they, he should have just wrote a letter and said, please send me the $165,000. Okay. Thank you, Your Honor. And, Jim. Please, go ahead, Bill. Good morning. I'm Jeffrey Wolf, appearing on behalf of BP West Coast Products, LLC, who will be referred to throughout my comments as, as BP primarily, or BP ARCO. We, we believe that very clearly the district court correctly granted cross-summary judgment in favor of BP for at least three or four distinct grounds, or on, on three or four distinct grounds. And, and what was the consequence of summary judgment for you? What did you get? We get, we get the, the right to recover the $175,000 that's in the account. And you got it as a result of the district court's reading of this June 21st letter? Correct. As a third-party beneficiary of this, what the district court saw as a contract? Correct. The district court saw it as a, as a, an accord and satisfaction. Alternatively, we argue that it was a compromise and settlement, which the district court didn't actually reach. But, very clearly, the June 21st letter meets the elements of a compromise and settlement under Arizona law. But, but your, your claim under the summary judgment really rests upon an entitlement under the June 21st letter? Yes, it does, your honor. Yeah. We believe, as I said, that either, as a matter of law, the letter amounts to an accord and satisfaction or compromise and settlement. But even if it's neither of those things, the, the, the June 21st letter, we believe, operates as an effective modification of the June 12th agreement between the bank and the Levins. And there was a question from your honor regarding the, whether there was an inconsistency between those two agreements. And I would submit to the court that there was no inconsistency between those two agreements. The, the June 12th agreement between the bank and the Levins set forth a very specific schedule under which the balance of the annuity, whatever that amount turned out to be, would be distributed to the bank. The, the agreement, I believe it was in paragraph six of the agreement, refers to the first $148,000 in the account to be used to cure the, the Levins defaults that, that were at that, that existed at that time. Point me to that paragraph. I've got the agreement here in front of me. It is it is actually on page four of the, of the agreement. Which agreement is this, counsel? The June 12th agreement. June 12th, uh-huh. And if you look at page four, it's actually, I'm, I'm sorry, paragraph four, page four. Correction, paragraph three, starting with paragraph three and going through paragraph five. It states that the first $148,000 of the account balance would be used to cure the borrower's defaults. Paragraph four says that the next $130,000 in the account would be used. So we're already up to about $280,000. Right. Which is inconsistent with the amount that's in the, in the annuity account. Right. And I'll, and I'll get over that amount. And I'll get to why it's fully consistent. Okay. In a moment. Okay. But the next $130,000 to be used for a savings account to, to be in which the bank would have a security interest, the next $80,000 would be used for cash injection to the LLC, which was BP's franchisee. And we're now up to $357,000. Right. Anything, and anything left after that was going to be used for the bank's attorney's fees. Right. Well, significantly in paragraph six of that agreement on page five, there is a recognition by the parties that there may not be enough to, to satisfy all these things. It specifically refers to the possibility of there being a lesser cash value being realized. Okay. Subsequent to, so it's all fine and good that the Lavins were willing to turn over their entire annuity account to the bank to satisfy their indebtedness on a $109,500 collateral assignment. But, but there's a real significant piece of the puzzle that's being overlooked here. At least that, that hasn't really been focused on so far in the two presentations. And that is that following June 12th, the bank made a demand on the basis of this letter, of this agreement, made a demand which John Hancock dishonored. That was a significant intervening event that changed the, the landscape of things. And- How did it change the landscape? That is to say, we've got an agreement between the Lavins and the bank. John Hancock, when faced with the demand for an amount that would cut into BPRCO's claimed collateral, understandably says, wait a minute, I'm not paying until that, that's resolved. Right, well- That's not inconsistent with the agreement. It's just, it's just John Hancock saying, wait a minute, I'm, I, I don't, I'm not comfortable yet because I need to know what happens to BPRCO. Well, as a result of John Hancock dishonoring the demand, and there, it's a symbolic agreement between the, the bank's counsel and John Hancock. It was followed by a letter from the bank's counsel on June, June 18th. Again, threatening litigation. You have what resulted in a new agreement on June 21st, the sole purpose of which is to distribute the money from the account. And the fact that there's a reference to a confidential- Well, new agreement, what it is is the June 21st letter that you characterize as an agreement. It references an agreement. It references the June 12th agreement. And it's a letter jointly signed by the Lavins and the bank that says, hand over the amount that's not in dispute. There's a disputed amount as to ARCO, and don't worry, we're leaving that disputed amount in, so at least let's get started and hand over the amount that's not disputed. But it doesn't say, at least let's get started. The sole purpose of the June 21st letter is to affect a distribution of the only of the contents of this account. And- But we do know, based on the June 12th agreement, that the Lavins have agreed to pay, if the amount in the account is sufficient to satisfy it, somewhere north of $350,000. They're on the hook to do that insofar as the annuity account is able to satisfy it. And this letter on June 21st says, well, at least pay off $165,000 because there's no ARCO claim to that amount. Well, I think that that's there's a factual inconsistency in how the Court just described that. The language of the June 21st letter doesn't say that. The language of the letter says, Mr. Lavin has agreed to distribute from the above reference annuity account the sum of $165,000. Right. And then it goes on to say, specifically, that should leave a balance of approximately $175,000 in the account sufficient to secure the ARCO lien. Why else would that be in there if the parties, all three of them that signed this agreement, didn't agree that the money would remain in the account? All three? All three, meaning the bank, the Lavins, and John Hancock. They were all, the three- I mean, it acted in response. Well, okay. John Hancock didn't sign. So the bank and the Lavins. All three interested parties, I guess you would say. Right. Why else would that statement be in there that it was being left? Well, I just gave you a reason. It's just to say it's to reassure John Hancock that if it makes this requested disbursement, there's enough money left over to satisfy ARCO if it turns out that the money is owed to ARCO. So their unwillingness to pay off on the June 12th demand letter, they understand that unwillingness, and they say, well, listen, that's okay, we'll leave that for, we'll settle that later. I mean, I'm putting this in between the lines. I fully understand that. But that seems to me a perfectly rational explanation of this letter. When you say why else would they do it, that's a reason why else they might have done it. But why would John Hancock do that if it left him on the hook for more money than is in the account, though? Why would John Hancock? Why would John Hancock disperse this amount if it left him on the hook, left it on the hook for more money than it had in the account taken into consideration BP's lien? Well, I don't think that they could release the ARCO's lien for the 175. I think that that was the whole point, was to keep that in the account to honor the lien if and when it became necessary. Anything else would not make good business sense. It wouldn't make good business sense to give all of the money that's not liened, but still leave yourself open to money that would come from somewhere else other than the account, would come from John Hancock's pockets or from John Hancock itself. That would not make sense to me, that John Hancock would say, okay, we're going to give $165,000. The other amount is encumbered, and we'll give you more later. That doesn't make sense to me. Right. Well, it's, and I think that's right. I think that's the way that John Hancock had to have looked at it, and I can't speak for what John Hancock was thinking, but obviously, John Hancock recognized that out of this pot of money, they were only going to release the unencumbered portion, or the portion that, leaving a portion available to satisfy a potential lien from ARCO. But if you look at the face of this document, this June 21st document, it meets the elements of accord and satisfaction under Arizona law. It meets the elements of a compromise and settlement because it's an agreement between two or more parties. It was signed to avoid a lawsuit, or the threat of a lawsuit, and is based on terms that amicably resolved differences over the distribution of the money. There's only one account. Okay. One account, and this is the way they divided it up, and we believe very strongly that the bank should be bound to the agreement that its attorney signed. Yeah, you're over time, is why I'm nodding my head. Okay. Thank you very much. Thank you, Your Honor. Extremely limited rebuttal. The law in Arizona, and it's Baker v. Emerson, which is an Arizona court of appeals case, is that there must be an agreement on the fact that the payment is tendered on the condition that it be accepted in full satisfaction of the claim. There is nothing in the summary judgment record to indicate that anybody at John Hancock ---- Was that an accord and satisfaction case? Yes. It's Baker v. Emerson. It's at — it's discussed at — starting at page 46 of our brief. And in the law, there are other cases as well in Arizona that has to be unequivocal. You can't just imply accord and satisfaction. You have to put somebody on notice. Hey, Buster, we're going to give you this money, but when you get this money, that's all you're getting. There is not one element in this set of facts that goes to those cases. That case was a little different because there was just a check sent. There was — there were no discussions or any settlement, discussions prior to that. But there were no discussions in this case saying that John Hancock will send the $165,000 only on the condition that it be accepted by the bank in full satisfaction of the claim. We don't know what the discussions were because they weren't — there were telephone calls, and we don't know what those discussions were. And that's exactly my point, Your Honor. This affirmative defense, the burden is on John Hancock and B.P. Elements. And there's this big vacuum in the record. You know, there is not this essential meeting of the minds element. There is not this essential communication that the money would only be tendered if it was accepted in full satisfaction. And that's all I have, Your Honors. Thank you. Thank you very much for your argument, both sides. A useful argument in a tricky case. The First National Bank of Arizona v. B.P. West Coast Products has now submitted for decision. We will take a brief recess, and then immediately upon reconvening, we will hear the last case on the argument calendar. Thank you.
judges: W. Fletcher, Rawlinson, Henderson